**KIS, S.A., PMI Photomagic, Ltd., and Image Dynamics, LLC., Plaintiffs,**

v.

**FOTO FANTASY, INC. d/b/a Fantasy Entertainment, Inc. and American Photo Booths, Inc., Defendants.**

**No. CIV.A.3:99–CV–1356–M.**

United States District Court, N.D. Texas, Dallas Division.

Jan. 15, 2002.

See also 204 F.Supp.2d 968.

Robert D. Yeager, Attorney at Law, James M. Joyce, Attorney at Law, Patrick J. McElhinny, Attorney at Law, Thomas A. Donovan, Attorney at Law, Kirkpatrick & Lockhart, Pittsburgh, PA, Jeffrey L. Snow, Attorney at Law, Kirkpatrick & Lockhart, Boston, MA, Stephen A. Kennedy, Attorney at Law, Elizabeth K. Stepp,

Attorney at Law, Frederick Linton Medlin, Attorney at Law, Michael D. Napoli, Attorney at Law, Jacqueline R. Peterson, Attorney at Law, Delia Spencer, Attorney at Law, Kirkpatrick & Lockhart, Dallas, TX, for plaintiffs.

P. Weston Musselman, Jr., Attorney at Law, Lisa Hayes Meyerhoff, Attorney at Law, John J. Marcoux, Attorney at Law, Jenkens & Gilchrist, Jay M. Vogelson, Attorney at Law, William F. LePage, Attorney at Law, Stutzman & Bromberg, Dallas, TX, Brett N. Dorny, Attorney at Law, Thomas M. Sullivan, Attorney at Law, A. Jason Mirabito, Attorney at Law, Michael T. Renaud, Attorney at Law, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, Boston, MA, Richard C. Sullivan, Jr., Attorney at Law, McLean, VA, Alexander Y. Thomas, Attorney at Law, Falls Church, VA, Jules E. Goldberg, Attorney at Law, New York City, for defendants.

John F. Booth, Crutsinger & Booth, Dallas, TX, pro se.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

LYNN, District Judge.

## I. Introduction

On June 16, 1999, Plaintiffs brought this action against Defendants, requesting a declaratory judgment that U.S. Patent Nos. 5,623,581 (the '581 patent) and 5,913,-019 (the '019 patent) are invalid, and requesting damages for Defendants' alleged infringement of claims 1–24 of U.S. Patent No. 5,539,453 (the '453 patent), Defendants' alleged violations of section 43 of the Lanham Act (15 U.S.C. § 1125) for misrepresentation[1] and false endorse-ment,[2] and Defendants' alleged violations of section 2 of the Sherman Act (15 U.S.C. § 2) for attempt to monopolize. Plaintiffs also requested that the Court pierce the corporate veil by holding Foto Fantasy liable for acts of American Photo Booths, Inc. ("APBI") that occurred prior to Foto Fantasy's buy-out of APBI's stock. Defendants counterclaimed that the '453 patent was invalid as it was obvious or antici-pated, and that the invention claimed therein was on sale or in publication at least a year prior to the U.S. patent appli-cation date.

On September 29, 2000, the parties stip-ulated to the invalidity of the '581 patent on grounds of obviousness. Plaintiffs later withdrew their request for declaratory judgment that the '019 patent was invalid and their request for damages for Defen-dants' alleged misrepresentation that the '581 patent prohibits the use of other photo sticker machines in Europe. Both parties filed motions for summary judg-ment on the remaining claims and counter-claims. In a hearing held on October 18, 2001, the Court granted Defendants' mo-tion for summary judgment on Plain-tiffs' '453 infringement claim, finding that Defendants did not infringe any of the asserted claim limitations, either literally or under the doctrine of equivalents. In its Order of October 31, 2001, the Court also denied Plaintiffs' request to pierce the corporate veil. The Court denied all other motions, finding that fact questions existed as to Plaintiffs' false endorsement and at-tempted monopolization claims.

From November 11, 2001 until Novem-ber 19, 2001, the Court held a bench trial on the false endorsement and attempted

---

1. The basis for Plaintiffs' misrepresentation claim was Defendants' alleged publication of advertisements in Europe which indicated that only Defendants' photo sticker machines can be legitimately used in Europe because of the '581 patent.

2. Plaintiffs assert that Defendants used Tom Cruise's image to market their photo kiosks, even though Defendants do not own the right to use Mr. Cruise's likeness.

monopolization claims. The Court hereby enters its findings of fact and conclusions of law on these issues, as required by Federal Rule of Civil Procedure 52(a), concluding that Plaintiffs did not meet their burden of proof as to either claim, and thus cannot prevail on their suit.

## II. Findings of Fact

### A. The Parties

1. All three Plaintiffs in this action are subsidiary companies of a British company called Photo–Me International, PLC, the world's largest manufacturer and operator of photo booths.

2. Plaintiff PMI Photomagic procures patents and licenses them to Photo–Me International.

3. KIS, S.A., a French corporation, manufactures photo booth equipment.

4. Plaintiff Image Dynamics is Photo–Me International's operating company in the United States. Image Dynamics was created in 1997, when Photo–Me International merged the assets of its U.S. subsidiary, Auto Photo Systems, Inc., with those of a competitor, Irata, Inc., to create Image Dynamics LLC, a Texas limited liability corporation. In 1999, Image Dynamics changed its name to Photo–Me USA, LLC, but will be referred to herein as "Image Dynamics."

5. Foto Fantasy is a New Hampshire-based company in the business of manufacturing and operating vending machines, including photo booths. Foto Fantasy sells and/or leases the following vending products: kiddie rides, color photo booths, photo sticker booths, Portrait Studios or so-called "sketch booths," penny press souvenir machines, and crane machines.

6. Foto Fantasy was started in 1987 to operate and sell operator-controlled photographic systems. It later developed, sold, and operated automatic photo booths.

7. On or about February 19, 1999, Foto Fantasy bought all of the shares of APBI. APBI had been in the photo sticker booth business. APBI's assets included photo sticker booths and some patents. While APBI continues as a corporate entity, it has held no assets nor had any business operations since its shares were purchased by Foto Fantasy.

### B. Plaintiffs' Lanham Act False Endorsement Claim

8. In late 1997, Foto Fantasy began testing and marketing a product called the Portrait Studio. The Portrait Studio produces sketch images of the user or sketch images of a photographic image the user inserts into the booth's scanner mechanism. These sketch images can be produced in a variety of styles, including as a cartoon image.

9. The Portrait Studio creates only sketch images. It does not produce a color or black and white photograph of the end user or of any image scanned into the machine by the end user.

10. No company in the Photo–Me International group, including Image Dynamics, has a booth that produces a sketch of the user or of a photograph scanned into the machine. This product is novel and attractive to customers.

11. The purpose of the design of the exterior of the Portrait Studio is to demonstrate to the end user the dual functionality of the booth and the unique end product it offers. The dominant displays on the Portrait Studio booth are four posters approximately 2'x3' showing the consumer what the booth does; these large posters are placed prominently on all four sides of the booth and they are the only displays on the ends of the booth. To further demonstrate the kinds of images produced and the booth's dual functions, Foto Fantasy has placed on the exterior sides of the

booth several 8″x10″ illustrations of the types of sketch images the booth produces in different styles, including a cartoon sketch image.

12. Information on the exteriors of the Portrait Studios tells the end user about the booth's two functions-creating a sketch image of the user or of a user-selected picture scanned into the machine.

13. The 8″x10″ illustrations on Portrait Studio booths include images of Marilyn Monroe, President Clinton, non-celebrities, and a black-and-white sketch image of Tom Cruise, which was made by scanning in one of two different photographic images of Mr. Cruise. The sketch image of Tom Cruise is in the top corner of the Portrait Studio above another sketch image, adjacent to a screen that allows someone to observe the image being produced if a user is inside the booth.

14. As further instruction to the end user on the booth's scanning functionality, across the right hand corner of the Tom Cruise sketch, in red capital letters, is the statement: "SCAN IN YOUR FAVOR-ITE CELEBRITIES." The sketch of Tom Cruise is not identified as an image of Tom Cruise and his name does not appear anywhere on the booth. The Tom Cruise sketch is displayed on one panel side and a similar Marilyn Monroe sketch image is displayed on the opposite panel in the same kind of grouping of image examples produced by the booth. The cartoon image of President Clinton and the other example images are similarly displayed. The celebrity scan-in example images are not displayed in a manner that is different from the non-celebrity images.

15. The sketch of Tom Cruise does not depict Tom Cruise using the booth, nor does it show Mr. Cruise posing in any manner that would suggest he uses the booth or has used the booth. Similarly, the sketches of Marilyn Monroe and President Clinton do not depict these celebrities using the booth, nor does it show them posing in any manner that would suggest either used the booth.

16. None of the sketch examples on the exterior of the Portrait Studio, including those of Tom Cruise, Marilyn Monroe, and President Clinton, are accompanied by any written or visual indication that the subjects of the sketches approve of, or have had anything whatsoever to do with, the Portrait Studio.

17. In addition to the Portrait Studio, Foto Fantasy makes and markets photo booths that superimpose "fun" images with the image of the user, thereby producing composite photographs. Where an output from a Foto Fantasy booth includes content not owned by Foto Fantasy, Foto Fantasy secures from the owner of that content a license to sell output that includes that content.

18. Foto Fantasy's Portrait Studio booths do not sell to the end user consumer any sketch picture that includes content with the image of Tom Cruise.

19. Plaintiffs have no rights to and do not use an image of Tom Cruise on their photo booths.

20. There is no evidence that retail location owners have been influenced by the sketch of Tom Cruise, Marilyn Monroe, or President Clinton on the side of the Portrait Studio booths in deciding to replace an Image Dynamics photo booth with a Foto Fantasy booth or to choose Foto Fantasy's booths over Image Dynamics' booths for placement in a retail location.

21. The only evidence presented on the location owners' reason for replacing Image Dynamics's booths with those of Foto Fantasy shows that the location owners' decision was motivated by the owners' unhappiness with the performance of Image Dynamics's booth, including the maintenance of it.

22. Plaintiffs' expert, Dr. Daniel J. Howard, conducted a survey concerning the image of Tom Cruise that appears on the Portrait Studio. The survey was conducted at NorthPark Mall in Dallas, Texas.

23. No opinion evidence offered by Plaintiffs in support of their Lanham Act claim is based on the Tom Cruise sketch image in the actual context in which it is presented to the public on the Portrait Studio booth. Participants in the survey were shown a photo of the 8″ × 10″ sketch of Tom Cruise, identified by Dr. Howard as a "Tom Cruise sketch."

24. Plaintiffs did not identify any sale to an end user that was diverted due to confusion over the placement of a Tom Cruise sketch on the exterior of the Portrait Studio. Similarly, Plaintiffs did not present evidence that any mall or other location owner replaced an Image Dynamics booth with a Foto Fantasy Portrait Studio because of a Tom Cruise sketch on the Portrait Studio.

25. Plaintiffs have presented no direct evidence that they have been injured by the use of the Tom Cruise sketch image on the Portrait Studio. To the extent Dr. Howard's testimony was offered for that purpose, or to evidence customer confusion, the Court does not find it persuasive.

26. Plaintiffs do not have any photo booths that produce sketch images or images from scanned images. There is no evidence that a user's choice of a Portrait Studio image or a photo image produced by other Foto Fantasy booths or Plaintiffs' booths is anything other than the personal preference of each individual user.

27. Plaintiffs have offered no evidence that they suffered damages that were a proximate result of the use of a Tom Cruise sketch on the Portrait Studio.

## C. Plaintiffs' Sherman Act Attempted Monopolization Claim

28. Photo booths compete for consumer purchases and retail location space with other types of vending and amusement products, including kiddie rides, electronic games, and carnival games. This constitutes the relevant product market in which Plaintiffs' and Defendants' photo booths compete. No recognizable submarket of photo booths, or of sticker photo booths, exists.

29. The geographic market for Plaintiffs' and Defendants' booths is the United States.

30. Plaintiffs did not satisfy their burden of proving that Defendants brought patent litigation for a purpose other than enforcing a patent.

31. Plaintiffs did not satisfy their burden of proving that Defendants brought patent litigation in bad faith.

32. Plaintiffs did not satisfy their burden of proving that Defendants brought patent litigation to enforce a patent they knew to be invalid.

33. Plaintiffs did not satisfy their burden of proving that Defendants brought patent litigation to enforce a patent procured by fraud on the Patent and Trademark Office.

34. Plaintiffs did not satisfy their burden of proving that Defendants had the specific intent to acquire monopoly power in the relevant market. Even if the market were defined to include only photo booths, Plaintiffs still did not satisfy their burden of proving Defendants had the specific intent to acquire monopoly power over that market.

35. There is not a dangerous probability that Defendants will acquire monopoly power in the relevant market. Even if the market were defined to include only photo

booths, Plaintiffs still did not satisfy their burden of proving that there is a dangerous probability of monopolization of that market.

36. Defendants do not have, and are not close to having, the power to exclude their competition from retail locations in the United States.

37. Foto Fantasy has photo booths in over 2,000 locations. In certain instances and in certain locations, a booth's rent cost may exceed its net sales. Any booth location subject to a fixed rent which experiences a problem that causes a low sales volume could produce a "rent percentage" of more than 100%; that is, in these circumstances the booth's rent cost could exceed its net sales.

38. In the year 2000, out of a total of more than 2,000 locations, Foto Fantasy had 31 booth locations that produced a rent percentage of more than 100%. When a Foto Fantasy booth's rent cost exceeded its net sales it was because of problems relating to booth operation, specific location, or similar issues. There is no evidence that Foto Fantasy agreed to pay rent to a retail location knowing or expecting that the net revenues from the booth placed at the retail location would be less than the rent.

39. Most of Foto Fantasy's photo booths are located in shopping malls or so-called "A" accounts, such as Disney, Universal Studios, and Six Flags amusement parks, throughout the country. In virtually every such location, Foto Fantasy must sign, and has signed, a standard specialty leasing tenant contract, which is typically for a one-year term, terminable at the will of the site owner, and without any exclusivity provisions.

40. Retail location owners have the unfettered right to terminate their leases with photo booth operators and they exercise that right in their own self-interest whenever they are not satisfied with the performance of a photo booth operator or wish to install a different product.

41. No photo booth operator, including Foto Fantasy, has or is close to having the power to raise retail prices to users of its photo booths without regard to the conduct of other competitors. Photo booths compete with vending and other amusement products at retail locations on the basis of utility, novelty, and price such that potential customers will patronize other available products if those other products are more useful or interesting or because of price.

42. In the United States, the market in which the Plaintiffs and Defendants operate has always been open to new entrants. Mall and amusement facility owners have the power to enter into leases or decline to do so on their own terms.

43. There are two categories of customers for photo booths: the retail location owners who place the booths, and the ultimate consumers who put money into the booth to have a picture taken or sketch made. In order to reach the ultimate consumer, the photo booth owner must successfully place the photo booth in a desirable, or high foot traffic, retail location.

44. Retail location owners consider photo booths to be part of the overall specialty leasing business, along with other amusement products, all of which are subject to short-term lease agreements with site owners that range from a day to one year. Generally, shopping mall owners use the same lease form for all specialty leasing products, including photo booths. In their standard specialty lease documents to which photo booth owners are subject, shopping mall owners require termination provisions that allow the termination of specialty leasing products, including photo booths, on three to thirty days written notice without cause. Specialty leasing products, including photo booths,

are referred to in the industry as "temporary tenants."

45. Lease agreements do not prevent a retail site owner from placing competitive photo booths at the same location. In fact, there are retail locations in the United States where both Image Dynamics and one of its photo booth competitors have photo booths. Similarly, a retail location owner does not have to offer a photo booth. A retail location owner that does not offer a photo booth offers customers some other vending or amusement product instead.

46. In order to be competitive in the photo booth business, one does not need to be a manufacturer of photo booths; rather, one need only have access to a supplier of photo booths. There are no significant barriers to entry into the markets of the United States and the financial cost of entry is relatively modest.

47. There are a variety of competitors in the photo booth business other than Foto Fantasy and Image Dynamics, and often, Image Dynamics's booths are not present where other competitors' booths are located.

48. Manufacturers from around the world compete in the business of manufacturing photo booths. Manufacturers from around the world ship their photo booths throughout the world.

49. The combination of Auto Photo and Irata in 1997 gave the newly formed Image Dynamics a total of approximately 2,400 photo booths in the United States. As a consequence of this merger, in 1997, Image Dynamics operated most of the photo booths in the United States. Despite this, Image Dynamics did not have monopoly power; it did not in any meaningful way control any market; it did not have the ability to exclude competitors; it did not have the ability to establish prices; it did not have the ability to exert any power to persuade or compel mall owners or owners of amusement venues to allow its photo booths into their facilities; it did not have the power or ability to set the terms of leases (including, among other terms, the rental amount and length of the lease terms) under which it was granted access to facilities; and it did not have the ability to set customer prices without regard to the prices of other amusement products located in the same facility or amusement space and in other facilities and amusement spaces. At no time, including the present time, have photo booths been a necessary or "hot" product that mall owners and owners of amusement spaces felt it critical to have in their facilities. At all times, photo booths were one of many amusement products that were available to fill the needs of mall owners and owners of other public spaces, and to attract the interest of customers.

50. Beginning in 1997, Image Dynamics's financial performance was poor and it was suffering from a declining market. The Irata/Auto Photo merger did not immediately produce profits. In fact, Image Dynamics's profits in the United States fell dramatically between April 1997 and April 1998.

51. Image Dynamics's poor performance was the result of increased competition, higher demand for rates of commissions from retail site owners as a result of increased competition, the fact that its products were becoming less competitive, and the lack of effective marketing, including a reduction in the size of Image Dynamics's sales staff.

52. Beginning in about 1997 and continuing to the present, Foto Fantasy has been among the sources of the increased competition faced by Image Dynamics. Because other vending and amusement products competed for mall and other space sought by photo booth suppliers,

they were also effective competitors with Image Dynamics for location space.

53. Image Dynamics did not have the financial resources necessary to develop and market new products unless the resources were provided by Photo–Me International, including its development and manufacturing company in France, KIS, S.A. Those resources were not forthcoming.

54. In fact, KIS manufactured photo booths for Kodak Corporation, a competitor to Image Dynamics, and shipped them to Kodak in the United States. KIS sold between 3,600 and 4,500 photo sticker booths to the United States operation of Kodak. KIS's sale of thousands of photo sticker booths to Kodak generated significant revenue for Photo–Me International in 1998, to the detriment of Image Dynamics.

55. As a result of the greater number of Image Dynamics's competitors and its own deficiencies, Image Dynamics's historic dominance in photo booths in the United States declined. Prior to the increase in competition, Image Dynamics had most of the booths in the United States; when competition from Foto Fantasy and others increased, Image Dynamics's market share decreased.

56. Beginning in 1997, Image Dynamics made vast cuts in personnel and material. As of August 2000, Image Dynamics' management had cut the company's sales force to the national sales manager and one other person.

57. Image Dynamics has had five different presidents since 1997. This contributed to a reduction in the confidence potential retail lessors had in Image Dynamics' stability.

58. On some occasions, Image Dynamics booths in the United States have been replaced at retail locations by Foto Fantasy's booths because Image Dynamics' equipment had become old and inoperable or because Foto Fantasy's machine quality and service was superior. Other photo booth companies have also displaced booths of Image Dynamics.

59. On or about February 19, 1999, Foto Fantasy bought all of the shares of APBI. APBI had almost all photo sticker booths. When Foto Fantasy acquired it, APBI had approximately 600 photo sticker booths, 500 of which are still in operation.

60. The demand for photo sticker booths in the United States has declined to such an extent that it is virtually static.

61. No barriers prevent Photo–Me International or KIS from shipping large quantities of photo sticker booths or any other type of photo booth into the United States.

62. As no market or submarket of photo sticker booths exist, APBI cannot be liable for attempted monopolization.

### D. Piercing the Corporate Veil

63. There are no facts, or alternatively, insufficient facts, to support a claim that Foto Fantasy is responsible for the acts and conduct of APBI under Texas Business Corporation Act art. 2.21(A)(2) (Vernon Supp.2001).

64. There are no facts, or alternatively, insufficient facts, to support a claim that Foto Fantasy used the corporate fiction of APBI in a manner that would allow Foto Fantasy to be held responsible for the acts and conduct of APBI based on any theories under which the corporate veil may be pierced to hold shareholders liable for corporate acts.

65. The foregoing findings of fact, numbers 1–64, are, when appropriate, conclusions of law under Federal Rule of Civil Procedure 52.

## III. Conclusions of Law

### A. Lanham Act Claim

■ 1. The test adopted in *Procter & Gamble Co. v. Amway Corp.*, 242 F.3d 539 (5th Cir.2001), for determining prudential standing under section 43 of the Lanham Act requires a court to weigh the following factors:

(1) The nature of the plaintiff's alleged injury: Is the injury "of a type that Congress sought to redress in providing a private remedy for violations of [the Lanham Act]?"

(2) The directness or indirectness of the asserted injury.

(3) The proximity or remoteness of the party to the alleged injurious conduct.

(4) The speculativeness of the damages claim.

(5) The risk of duplicative damages or complexity in apportioning damages.

*Id.* at 563. Plaintiffs do not have prudential standing to pursue their claims under section 43 of the Lanham Act due to their failure to present evidence to satisfy the second, fourth, and fifth factors. First, Plaintiffs have not shown that they have suffered a direct injury from Defendants' use of Tom Cruise's image on the outside of their Portrait Studios. Additionally, Plaintiffs have not presented any evidence of lost profits or other damages they have suffered as a result of Defendants' alleged conduct. Finally, prudential standing is lacking under the fifth factor, because if standing were allowed here, "every competitor in the market [could] sue" Defendants. *Id.* at 564.

■ 2. Even if Plaintiffs had standing to assert a Lanham Act claim, Defendants have not violated the first prong of the Lanham Act, 15 U.S.C. § 1125(2)(1)(A). The sketch image of Tom Cruise was used by Foto Fantasy, along with other celebrity and non-celebrity images and descriptive posters, to demonstrate the functions and products of the Portrait Studio. The various celebrity sketch images must be viewed together as they are displayed to the public. In that context, there is not a likelihood of confusion or deception as to the affiliation, connection, or association of the celebrities depicted as to the origin, sponsorship, or approval of the Portrait Studio.

3. Defendants have not violated the second prong of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B), in that Foto Fantasy has not misrepresented in commercial advertising or promotion the nature, characteristic, qualities, or geographic origin of its products, services, or commercial activities.

4. Plaintiffs have not suffered an injury nor are they likely to suffer an injury as a result of Defendants' use of a Tom Cruise image on their Portrait Studios.

5. Plaintiffs have suffered no damages as a proximate result of the use of a Tom Cruise sketch on the Portrait Studio.

### B. Sherman Act Claim

■ 6. Plaintiffs have not satisfied the requirements of *Handgards* or *Walker Process* so as to be able to bring an antitrust claim against Defendants for Defendants' patent litigation. *See Walker Process Equip. v. Food Machinery & Chem. Corp.*, 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965); *Handgards, Inc. v. Ethicon, Inc.*, 601 F.2d 986, 990 (9th Cir. 1979).

7. Defendants have not engaged in predatory or exclusionary conduct.

8. Defendants do not have a specific intent to monopolize.

9. A dangerous probability does not exist that Defendants will successfully obtain monopoly power.

10. Defendants have not violated the Sherman Act, 15 U.S.C. § 2.

11. The foregoing conclusions of law, numbers 1–10, are, when appropriate, findings of fact under Federal Rule of Civil Procedure 52.

### IV. Conclusion

Based upon the findings of fact and conclusions of law previously set forth, the Court determines that Plaintiffs cannot prevail on their suit. Defendants therefore are entitled to judgment in their favor. The Court will enter judgment by separate document, pursuant to FED. R. CIV. P. 58, in favor of Defendants.

SO ORDERED.