[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 22, 2007
THOMAS K. KAHN
CLERK

_____

No. 06-14726

_____

D. C. Docket No. 06-00394-CV-CAP-1

PHOENIX OF BROWARD, INC.,
on behalf of Itself and Similarly
Situated Burger King Franchisees,
1101 S. Rogers Circle, Suite 10,
Boca Raton, Florida 33487,

                                                    Plaintiff-Appellant,

versus

MCDONALD'S CORPORATION,
One McDonald Plaza, Oak Brook,
Illinois 60523,

                                                    Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

**(June 22, 2007)**

Before PRYOR, KRAVITCH and ALARCON,[*] Circuit Judges.

KRAVITCH, Circuit Judge:

The primary issue in this appeal is the proper test for determining whether a party has prudential standing to bring a false advertising claim under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). Phoenix of Broward, Inc. ("Phoenix") appeals the district court's dismissal of its false advertising claim against McDonald's Corporation ("McDonald's") for lack of prudential standing. For the reasons that follow, we adopt the test for prudential standing set forth in Conte Bros. Automotive, Inc. v. Quaker State-Slick 50, Inc., 165 F.3d 221, 225 (3d Cir. 1998), and affirm the district court's dismissal.

## I. BACKGROUND

Burger King Corporation ("Burger King") owns, operates, and franchises fast food restaurants throughout the world. Today, there are approximately 11,000 Burger King restaurants worldwide. Appellant Phoenix is a licensed Burger King franchisee that owns and operates a Burger King franchise in Fort Lauderdale, Florida. McDonald's, like Burger King, owns, operates, and franchises fast food restaurants throughout the world, and there are approximately 30,000 McDonald's restaurants worldwide. As competitors in the fast food industry, both McDonald's

[*] Honorable Arthur L. Alarcon, United States Circuit Judge for the Ninth Circuit, sitting by designation.

and Burger King have employed a variety of marketing and promotional strategies to attract customers, generate sales, and ensure customer loyalty.

From 1995 to August 2001, McDonald's offered customers the opportunity to participate in various promotional games such as "Monopoly Games at McDonald's," "The Deluxe Monopoly Game," "Who Wants to be a Millionaire," and "Hatch, Match and Win." Each of the promotional games featured low-value, mid-value, and high-value prizes. The low-value prizes included low-dollar cash awards and food and beverage items, while the high-value prizes included automobiles and cash awards of up to $1 million dollars. In general, customers could win the $1 million grand prize in one of two ways—by obtaining one of the rare $1 million, instant-winner game pieces *or* by collecting and matching a combination of certain other game pieces.

McDonald's conducted an extensive advertising and marketing campaign for each of the games it offered. In these advertisements, McDonald's represented that all customers who participated in the games had a fair and equal opportunity to win the offered prizes. The advertisements also represented the specific odds of winning certain prizes, including the high-value prizes.

In approximately April 2000, the Federal Bureau of Investigation ("FBI") began investigating the promotional games. While the games were still underway,

3

the FBI informed McDonald's that there were problems with the random distribution of its game pieces. In spite of this alleged knowledge, McDonald's continued to advertise that customers had a fair and equal opportunity to win the offered prizes, including the high-value prizes.

On August 21, 2001, the United States Department of Justice ("DOJ") and the FBI announced that between 1995 and August 2001, certain of McDonald's promotional games had been compromised by a criminal ring led by an employee of Simon Marketing, Inc. ("Simon"), the company McDonald's engaged to operate the promotional games. From approximately 1995 to August 2001, Simon's Director of Security, Jerome Jacobson, diverted at least $20 million in high-value prizes by embezzling winning, high-value game pieces and distributing them to a network of "winners" who claimed (or recruited others to claim) the prizes from McDonald's. The DOJ and FBI announced that eight individuals, including Jacobson, had been arrested in connection with the scheme. In announcing the arrests, the U.S. Attorney General stated that the "fraud scheme denied McDonald's customers a fair and equal chance of winning." In a corporate press release issued after the arrests, McDonald's Chairman and Chief Executive Officer described the scheme as "a highly sophisticated inside game of fraud and deception."

4

On or about April 5, 2002, Jacobson pleaded guilty to charges of conspiracy and mail fraud. Approximately 50 other persons either pleaded guilty or were convicted in connection with the conspiracy.

Following the disclosure of the scheme, McDonald's created an independent task force to review all of its promotional practices, and it introduced additional security procedures to ensure the integrity of future promotional games. Nonetheless, consumers throughout the U.S. filed several class actions against McDonald's, alleging consumer fraud, negligence, and unjust enrichment. On April 19, 2002, McDonald's settled these class actions by, inter alia, agreeing to implement a $15 million "Instant Giveaway," providing class members and the general public an opportunity to win fifteen $1 million prizes.

On February 22, 2006, Phoenix filed the instant action against McDonald's on behalf of itself and all similarly situated Burger King franchisees (a proposed class of approximately 1,100 franchisees), alleging false advertising in violation of § 43(a) of the Lanham Act. Specifically, Phoenix alleged that McDonald's misrepresented that each player in its promotional games had a fair and equal chance of winning high-value prizes and misrepresented the specific odds of winning high-value prizes. According to Phoenix, McDonald's promotional games were "rigged from approximately 1995-2001," those games lured customers away

5

from Burger King and yielded an "unnatural" spike in profits for McDonald's, the high-value prizes (including the $1 million prizes) were diverted from McDonald's customers, and the "advertising campaigns that touted million dollar prizes were literally false." Phoenix also alleged that after learning that the games had been compromised, McDonald's knowingly and deliberately continued to advertise the games as though customers had a fair and equal chance of winning.

McDonald's moved to dismiss Phoenix's complaint on the grounds that Phoenix lacked prudential standing under the Lanham Act and, in the alternative, that Jacobson's theft was an intervening cause of Phoenix's alleged injury. On August 1, 2006, the district court issued a written order granting McDonald's motion and dismissing the action with prejudice. Noting that the Eleventh Circuit had not addressed the appropriate standard for determining whether a plaintiff has prudential standing to bring a false advertising claim under § 43(a) of the Lanham Act, the district court surveyed the case law of other circuits and adopted the five-factor test set forth by the Third Circuit in Conte Bros., 165 F.3d at 225, finding that test to be more "persuasive" than the "categorical approach" adopted by several other circuits. Applying the Conte Bros. test, the district court concluded that Phoenix did not have prudential standing to bring a false advertisement claim under the Lanham Act against McDonald's. Phoenix now appeals.

6

## II. DISCUSSION

On appeal, Phoenix argues that the district court erred in dismissing its complaint against McDonald's for lack of prudential standing. "We review standing determinations de novo." Bochese v. Town of Ponce Inlet, 405 F.3d 964, 975 (11th Cir. 2005). "We review a district court's grant of a motion to dismiss de novo, taking as true the facts as they are alleged in the complaint." Owens v. Samkle Auto. Inc., 425 F.3d 1318, 1320 (11th Cir. 2005).

"In every federal case, the party bringing the suit must establish standing to prosecute the action." Elk Grove Unified Sch. Dist. v. Newdow, 542 U.S. 1, 11, 124 S.Ct. 2301, 2308, 159 L.Ed.2d 98 (2004). As the Supreme Court has explained, standing jurisprudence is comprised of "two strands: Article III standing, which enforces the Constitution's case-or-controversy requirement, and prudential standing, which embodies judicially self-imposed limits on the exercise of federal jurisdiction." Id. at 11-12, 124 S.Ct. at 2308 (internal quotation marks and citation omitted).

To demonstrate Article III standing, a plaintiff must allege that (1) he has suffered an actual or threatened injury, (2) the injury is fairly traceable to the challenged conduct of the defendant, and (3) the injury is likely to be redressed by a favorable ruling. Primera Iglesia Bautista Hispana of Boca Raton, Inc. v.

7

Broward County, 450 F.3d 1295, 1304 (11th Cir. 2006).

McDonald's does not dispute that the allegations in Phoenix's complaint satisfy these constitutional standing requirements. Because the issue of constitutional standing is jurisdictional, however, we address it here. See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 91-93, 118 S.Ct. 1003, 1011, 140 L.Ed.2d 210 (1998) (stating that the question of Article III standing is jurisdictional and should be addressed before issues of prudential and statutory standing); Conte Bros., 165 F.3d at 225.

In its complaint, Phoenix alleges that "[a]s a direct and proximate result of McDonald's false . . . advertising and unfair competition, customers were diverted from Phoenix and its Affiliated Franchisees, who accordingly not only lost profits due, inter alia, to reduced sales, but also incurred costs in connection with common counteractive efforts to retain those customers." Although Phoenix does not allege that McDonald's or any of its employees participated in the theft that led to the compromising of the high-value games (allegedly rendering McDonald's advertisements false), Phoenix does allege that after McDonald's learned that the high-value games had been compromised, it knowingly and deliberately advertised that customers had a fair and equal opportunity to win high-value prizes. These allegations satisfy the first two prongs of the constitutional standing

8

inquiry—Phoenix alleges that it has suffered an actual injury that is fairly traceable to McDonald's alleged misconduct. See Primera Iglesia, 450 F.3d at 1304. In relief, Phoenix requests, among other things, "actual damages, in amounts to be demonstrated at trial for the harms directly and proximately caused by McDonald's false . . . advertising" and "other damages incurred," including "advertising costs incurred to respond to the fixed promotional games." If granted, this relief would redress the injuries alleged and thus satisfies the third prong of the standing inquiry. See id. Based on the allegations in the complaint, we conclude that Phoenix has satisfied the requirements of constitutional standing.

Even where constitutional standing exists, however, prudential considerations may preclude standing. Wooden v. Bd. of Regents of Univ. Sys. of Ga., 247 F.3d 1262, 1273 n.12 (11th Cir. 2001). We therefore turn to the issue of prudential standing.

## A. Whether Prudential Standing Doctrine Applies to the Lanham Act

We must first determine whether Congress intended to abrogate prudential standing doctrine in passing § 43(a) of the Lanham Act. Section 43(a) provides:

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
    (A) is likely to cause confusion, or to cause mistake, or to deceive

9

as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action *by any person who believes that he or she is or is likely to be damaged* by such act.

15 U.S.C. § 1125(a) (emphasis added).

The issue of whether prudential standing doctrine applies to § 43(a) of the Lanham Act is one of first impression in this circuit. The Third and Fifth Circuits have addressed this question, and both have held that Congress did not abrogate prudential limitations on the standing of plaintiffs to bring suit under § 43(a). See Conte Bros., 165 F.3d at 227-230; Procter & Gamble Co. v. Amway Corp., 242 F.3d 539, 561-62 (5th Cir. 2001). We agree.

Congress is presumed to incorporate background prudential standing limitations unless the statute expressly negates such principles. Bennett v. Spear, 520 U.S. 154, 163, 117 S.Ct. 1154, 1162, 137 L.Ed.2d 281 (1997). Although § 43(a)'s use of the term "any person" might lead to the conclusion that Congress intended to negate the background of prudential standing by allowing "any person" who could achieve Article III standing to bring suit, "the Supreme Court has twice held that Congress has not expressly abrogated prudential standing doctrine merely

10

by passing a statute the text of which admits a broad interpretation." Conte Bros., 165 F.3d at 227. For example, in Associated General Contractors of California, Inc. v. California State Council of Carpenters, the Supreme Court held that Congress did not abrogate prudential standing principles when it enacted the Clayton Act, despite statutory language allowing "[a]ny person who shall be injured in his business or property" to bring suit under that act. 459 U.S. 519, 535 & n.31, 103 S.Ct. 897, 907 & n.31, 74 L.Ed.2d 723 (1983). And as noted by the courts in Conte Bros. and Procter & Gamble, language contained in § 45 of the Lanham Act "makes clear that the focus of the [Lanham Act] is on anti-competitive conduct in a commercial context,"[1] so that conferring standing to the full extent implied by the plain language of § 43(a) would give standing to parties that have *not* had their competitive or commercial interests affected by the defendant's conduct. Conte Bros., 165 F.3d at 229; Procter & Gamble, 242 F.3d at 561.

---

[1] Section 45 provides in pertinent part:
The intent of this chapter is to regulate commerce within the control of Congress by making actionable the deceptive and misleading use of marks in such commerce; to protect registered marks used in such commerce from interference by State, or territorial legislation; *to protect persons engaged in such commerce against unfair competition*; to prevent fraud and deception in such commerce by the use of reproductions, copies, counterfeits, or colorable imitations of registered marks; and to provide rights and remedies stipulated by treaties and conventions respecting trademarks, trade names, and unfair competition entered into between the United States and foreign nations.
15 U.S.C. § 1127 (emphasis added).

Rather, "[t]he congressionally-stated purpose of the Lanham Act" evinces a congressional "intent to limit standing to a narrow class of potential plaintiffs possessing interests the protection of which furthers" that congressionally stated purpose. Conte Bros., 165 F.3d at 229.

Accordingly, in light of the text of § 43(a) and the purpose of the Lanham Act as expressed in § 45, we join the Third and the Fifth Circuits and hold that Congress did not intend to abrogate prudential standing limitations when it enacted the Lanham Act.

## B. The Appropriate Test for Prudential Standing Under § 43(a)

Phoenix argues that the district court applied the wrong test to determine whether Phoenix had prudential standing to bring its false advertising claim against McDonald's. According to Phoenix, the district court erred in applying the five-factor test articulated by the Third Circuit in Conte Bros., and instead, the court should have applied the "categorical approach" that, according to Phoenix, "controls in most" of the circuit courts of appeals.

This court has not addressed the appropriate test for determining whether a plaintiff has prudential standing to bring a false advertising claim under § 43(a) of the Lanham Act. After surveying the caselaw from other circuits and examining the parties' arguments, we join the Third and Fifth Circuits and adopt the test for

prudential standing articulated in <u>Conte Bros.</u>[2]  We therefore hold that to determine

whether a party has prudential standing to bring a false advertising claim under

§ 43(a) of the Lanham Act, a court should consider and weigh the following

factors:

> (1) The nature of the plaintiff's alleged injury:  Is the injury of a type
> that Congress sought to redress in providing a private remedy for
> violations of the [Lanham Act]?
> (2) The directness or indirectness of the asserted injury.
> (3) The proximity or remoteness of the party to the alleged injurious
> conduct.
> (4) The speculativeness of the damages claim.
> (5) The risk of duplicative damages or complexity in apportioning
> damages.

<u>Conte Bros.</u>, 165 F.3d at 233 (internal quotation marks and citations omitted);[3]

<u>Procter & Gamble</u>, 242 F.3d at 562 (adopting the <u>Conte Bros.</u> test for determining

prudential standing under the Lanham Act).  We believe that this test "provides

appropriate flexibility in application to address factually disparate scenarios that

may arise in the future, while at the same time supplying a principled means for

---

[2] To date, the Third and Fifth Circuits are the only circuits to have adopted the test set forth in <u>Conte Bros. Automotive, Inc. v. Quaker State-Slick 50, Inc</u>., 165 F.3d 221, 233 (3d Cir. 1998), as the standard for determining whether a plaintiff has prudential standing under § 43(a) of the Lanham Act.  See <u>Am. Ass'n of Orthodontists v. Yellow Book USA, Inc.</u>, 434 F.3d 1100, 1104 (8th Cir. 2006).

[3] In announcing this standard, the Third Circuit adopted the test for standing under the Sherman Act articulated by the Supreme Court in <u>Associated General Contractors of California, Inc. v. California State Council of Carpenters</u>, 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983).  <u>Conte Bros.</u>, 165 F.3d at 233.

13

addressing standing under . . . § 43(a)." Conte Bros., 165 F.3d at 236. Indeed, "two prominent commentaries" have endorsed this standard. Procter & Gamble, 242 F.3d at 562 n.51 (citing 4 McCarthy, McCarthy on Trademarks and Unfair Competition § 27:32 n.1 (4th ed. 1996) ("In the author's opinion, some limit on the § 43(a) standing of persons remote from the directly impacted party should be applied by analogy to antitrust law, such as use of the criteria listed in Associated General Contractors . . . ."); Restatement (Third) of Unfair Competition § 3 cmt.f (1995) ("In determining whether an asserted injury is sufficiently direct to justify the imposition of liability, the Supreme Court's analysis of similar issues under federal antitrust law may offer a useful analogy.")). And under this standard, "standing under the Lanham Act does not turn on the label placed on the relationship between the parties." Conte Bros., 165 F.3d at 235.

Phoenix argues that this court should adopt the so-called "categorical approach" that is applied in the majority of the circuits, as under that approach, "actual" or "direct" competition is the "exclusive requirement" for determining prudential standing. To that end, Phoenix argues that the Conte Bros. test was formulated in order to extend prudential standing under the Lanham Act to parties who are *not* in "actual" or "direct" competition. Thus, according to Phoenix, the Conte Bros. factors "inevitably collapse" into the categorical approach when

14

applied to a "direct competitor" alleging a "competitive injury," and therefore, direct competitors "invariably satisfy" the Conte Bros. requirements. We address each argument in turn.

Of the circuits that have not adopted the Conte Bros. test, the Seventh, Ninth, and Tenth Circuits have come the closest to "categorically" holding that the plaintiff must be in "actual" or "direct" competition with the defendant and assert a "competitive injury to establish prudential standing under § 43(a)."[4] See, e.g., Jack Russell Terrier Network of N. Ca. v. Am. Kennel Club, Inc., 407 F.3d 1027, 1037 (9th Cir. 2005) (holding that to establish "standing pursuant to the 'false advertising' prong of § 43(a) of the Lanham Act, a plaintiff must show: (1) a

_____

[4] Contrary to Phoenix's contention, it appears that the Fourth Circuit has not adopted the so-called categorical approach followed in the Seventh, Ninth, and Tenth Circuits. In Made in the USA Foundation v. Phillips Foods, Inc., the Fourth Circuit stated that "in an earlier case involving commercial parties, we noted in passing that the Lanham Act is 'a private remedy [for a] commercial plaintiff who meets the burden of proving that its commercial interests have been harmed by a competitor's false advertising.'" 365 F.3d 278, 281 (4th Cir. 2004) (quoting Mylan Labs., Inc. v. Matkari, 7 F.3d 1130, 1139 (4th Cir. 1993)) (emphasis added). And after examining opinions from the First, Second, Third, Seventh, and Tenth Circuits, the Fourth Circuit acknowledged that "there might be some marginal differences in the circuits about what qualifies as a commercial or competitive interest for standing purposes under the Lanham Act" and determined that "the basic approach of other circuits . . . requires the Lanham Act plaintiff to be engaged in commercial activity." Id. at 280-81 (examining Conte Bros., 165 F.3d at 229; Stanfield v. Osborne Indus., Inc., 52 F.3d 867, 873 (10th Cir. 1995); Dovenmuehle v. Gilldorn Mortgage Midwest Corp., 871 F.2d 697, 700 (7th Cir. 1989); Berni v. Int'l Gourmet Rests. of Am., Inc., 838 F.2d 642, 648 (2d Cir. 1988); Camel Hair & Cashmere Inst. of Am., Inc. v. Associated Dry Goods Corp., 799 F.2d 6, 11-12 (1st Cir. 1986)). The court endorsed this "basic approach," and as a result, it concluded that a consumer does not have standing to sue for false advertising under the Lanham Act. Id. at 281. Thus, rather than adopt the categorical approach followed by the Seventh, Ninth, and Tenth Circuits, the Fourth Circuit endorsed the "basic approach" of requiring that the plaintiff be engaged in commercial activity—an approach followed by all circuits that have addressed the issue. Id.

commercial injury based upon a misrepresentation about a product; and (2) that the injury is 'competitive,' or harmful to the plaintiff's ability to compete with the defendant" (citation omitted)); Hutchinson v. Pfeil, 211 F.3d 515, 520 (10th Cir. 2000) (holding that the plaintiff lacked standing because his hopes of eventually obtaining a product to compete with the defendant's were too remote, and his inability to compete with the defendant was not a function of the defendant's alleged misconduct); Johnny Blastoff, Inc. v. L.A. Rams Football Co., 188 F.3d 427, 438 (7th Cir. 1999) (holding that "a party must demonstrate that it has a reasonable interest to be protected against conduct violating the Act[,]" by asserting "a discernable competitive injury" (internal quotations omitted)); Stanfield v. Osborne Indus., Inc., 52 F.3d 867, 873 (10th Cir. 1995) (holding that the plaintiff "must be a competitor of the defendant and allege a competitive injury"); L.S. Heath & Son, Inc. v. AT&T Info. Sys., Inc., 9 F.3d 561, 575 (7th Cir. 1993) (holding that "the plaintiff must assert a discernible competitive injury"); Waits v. Frito-Lay, Inc., 978 F.2d 1093, 1109 (9th Cir. 1992) (same).

In contrast to the Seventh, Ninth, and Tenth Circuits, the First and Second Circuits have applied a less categorical approach to determine standing, wherein the dispositive issue is not the degree of "competition," but whether the plaintiff

16

has a "reasonable interest" to be protected against the type of harm that the Lanham Act is intended to prevent. See, e.g., Ortho Pharm. Corp. v. Cosprophar, Inc., 32 F.3d 690, 694 (2d Cir. 1994); Camel Hair & Cashmere Inst., Inc. v. Associated Dry Goods Corp., 799 F.2d 6, 11 (1st Cir. 1986). In Camel Hair, a trade group of cashmere garment producers filed a Lanham Act suit alleging that a coat manufacturer had misrepresented the cashmere content of one of its products. 799 F.2d at 6-8. In discussing the issue of standing, the First Circuit said: "the plaintiff [must have] a *reasonable interest* in being protected [against false advertising]. . . . [I]t is [not enough] for the plaintiff merely to establish a falsehood in the defendant's advertising or marketing; the plaintiff must also show a link or 'nexus' between itself and the alleged falsehood." Id. at 11-12 (emphasis added). Concluding that the trade group had standing, the First Circuit stated that "[although] *none* of the [group's] members *compete with the defendant* . . . their position as manufacturers and vendors of fabric and clothing containing cashmere *gives them a strong interest* in preserving cashmere's reputation as a high quality fibre." Id. at 12 (emphasis added).

In the Second Circuit, a plaintiff bringing a false advertising claim under the Lanham Act "must demonstrate both (1) a reasonable interest to be protected against the advertiser's false or misleading claims, and (2) a reasonable basis for

17

believing that this interest is likely to be damaged by the false or misleading advertising." ITC Ltd. v. Punchgini, Inc., 482 F.3d 135, 169 (2d Cir. 2007) (internal quotation marks omitted); accord Societe Des Hotels Meridien v. LaSalle Hotel Operating P'ship, L.P., 380 F.3d 126, 130 (2d Cir. 2004); Havana Club Holding, S.A. v. Galleon S.A., 203 F.3d 116, 130 (2d Cir. 2000); PDK Labs, Inc. v. Friedlander, 103 F.3d 1105, 1111 (2d Cir. 1997). "The reasonable interest prong of this test includes commercial interests, direct pecuniary interests, and even a future potential for a commercial or competitive injury[,]" while "the reasonable basis prong requires the plaintiff to show *both* likely injury *and* a *causal nexus* to the false advertising." ITC, 482 F.3d at 169-70 (internal quotation marks omitted) (emphasis added). And under the Second Circuit's approach, a plaintiff asserting a false advertising claim under § 43(a) need not be a "competitor." See PDK Labs, 103 F.3d at 1111; Ortho, 32 F.3d at 694; Berni v. Int'l Gourmet Rests. of Am., Inc., 838 F.2d 642, 648 (2d Cir. 1988). Instead, "where the plaintiff's products are not obviously in competition with [the] defendant's products," the "plaintiff must make a more substantial showing of injury and causation." PDK Labs, 103 F.3d at 1111 (quotation marks omitted).

Thus, contrary to Phoenix's assertions, the majority of the circuits do not hold "categorically" that actual or direct competition is the exclusive requirement

18

for standing to bring a false advertising claim under the Lanham Act.[5]

We also disagree with Phoenix's assertion that the Third Circuit adopted the Conte Bros. test to "extend prudential standing" to parties who are not in "direct" or "actual" competition. In determining the appropriate test for prudential standing under § 43(a), the Conte Bros. court first noted that the Third Circuit's previous cases addressing § 43(a)'s standing requirements "defined the dispositive question of a party's prudential standing as whether the party has a *reasonable interest* to be protected against false advertising." Conte Bros., 165 F.3d at 230 (internal quotation marks omitted) (emphasis added). Although the court had "never precisely defined the critical term 'reasonable interest,'" it had "carried forward this prudential 'reasonable interest' requirement and ha[d] grappled with defining the term with greater precision." Id. at 230-31. In adopting the five-factor test discussed above, the court expressly declined to adopt standards conferring standing only on "direct competitors or their surrogates," as such standards were

---

[5] Phoenix further contends that the district court erroneously framed the Conte Bros. test and the "categorical approach" as "opposite sides of a circuit split coin." Although we agree that the Conte Bros. test and the categorical approach are not necessarily on opposite sides of a circuit split, we nonetheless conclude that there is tension between the two approaches with regards to the degree of actual competition required between the plaintiff and the defendant. See, e.g., Am. Ass'n of Orthodontists, 434 F.3d at 1103-04 (recognizing differences between circuits that "have held, categorically, that false advertising claims not involving misuse of a trademark are actionable only when brought by competitors of the wrongdoer[,]" and those circuits that "have adopted a less categorical multi-factor test . . . that focuses judicial enforcement of the Lanham Act on the protection of commercial interests and the prevention of competitive harm" (internal quotation marks omitted)).

19

"in tension" with language from a previous Third Circuit opinion which implied that parties "not in direct competition" may nonetheless "have standing to sue if they have a reasonable interest to be protected against false advertising." Id. at 232 (citing Serbin v. Ziebart Int'l Corp., 11 F.3d 1163, 1176-77 (3d Cir. 1993)) (internal quotation marks omitted). The court also cited earlier cases from the First and Second Circuits that recognized standing for Lanham Act plaintiffs who were *not* in direct competition with the defendant. Id. at 231-32 (citing PPX Enters., Inc. v. Audiofidelity, Inc., 746 F.2d 120 (2d Cir. 1984) (holding that the owner of royalty streams from a music recording had standing to sue a distributor of falsely labeled music recordings); Camel Hair, 799 F.2d at 11 (holding that a trade association of manufacturers of cashmere fibers and fabrics, but not of finished coats, had standing to sue retailers of coats falsely labeled as containing more cashmere than they had)). Thus, even before the Conte Bros. decision, the Third Circuit had implied, and the First and Second Circuits had held expressly, that parties who are *not* in "direct" or "actual" competition may nonetheless have prudential standing to bring false advertising claims under the Lanham Act.

Finally, we disagree with Phoenix's contention that "direct competitors" alleging a "competitive" injury "invariably satisfy" the Conte Bros. requirements. Rather than blindly accept a plaintiff's allegation that it is a "competitor" that has

20

suffered a "competitive injury," the Conte Bros. test is designed to determine whether the injury alleged is the type of injury that the Lanham Act was designed to redress—harm to the plaintiff's "ability to compete" in the marketplace and erosion of the plaintiff's "good will and reputation" that has been directly and proximately caused by the defendant's false advertising. Id. at 234-36. Moreover, at least one federal court (in addition to the district court below) has applied the Conte Bros. test where the plaintiff and defendant were "direct competitors" and held that the plaintiff lacked prudential standing. See, e.g., KIS, S.A. v. Foto Fantasy, Inc., 240 F. Supp. 2d 608, 610-11, 616 (N.D. Tex. 2002) (applying the Conte Bros. test and holding that the plaintiff, a manufacturer and operator of photo booths, lacked prudential standing to bring a false advertising claim against the defendant, also a manufacturer and operator of photo booths, even though the plaintiff and defendant were direct competitors in the photo booth industry). And even accepting Phoenix's argument, as stated above, we conclude that the Conte Bros. test "provides appropriate flexibility in application to address factually disparate scenarios that may arise in the future, while at the same time supplying a principled means for addressing standing under" § 43(a) of the Lanham Act. Conte Bros., 165 F.3d at 236.

In summary, we hold that to determine whether a plaintiff has prudential

21

standing to bring a false advertising claim under § 43(a) of the Lanham Act, a court must consider and weigh the five factors articulated in the Conte Bros. opinion.

## C. Applying the Conte Bros. Test for Prudential Standing

Phoenix argues that it satisfied the requirements of prudential standing under the Conte Bros. test. After examining and weighing the Conte Bros. factors, we conclude otherwise.

### 1. Type of Injury Alleged

The first factor directs us to determine "whether the alleged injury is of a type Congress sought to redress in providing a private remedy for violations of the Lanham Act." Procter & Gamble, 242 F.3d at 563. As the Conte Bros. court noted, the focus of § 43(a) is on protecting "commercial interests [that] have been harmed by a competitor's false advertising, and in secur[ing] to the business community the advantages of reputation and good will by preventing their diversion from those who have created them to those who have not." Conte Bros., 165 F.3d at 234 (alterations in original) (citation omitted).

In its complaint, Phoenix alleges that (1) McDonald's falsely advertised that customers who purchased its products had a fair and equal chance to win any of the prizes offered, including the high-value prizes; (2) during the run of the games, McDonald's experienced an "unnatural spike" in its sales while Burger King

22

experienced a decrease in its sales; and (3) Burger King franchisees incurred counter-promotion costs in an effort to "lure back customers who frequented McDonald's while the fraudulent games were running."  In our view, these allegations amount to an assertion by Phoenix that its "commercial interests" were "harmed by a competitor's false advertising," and this is the type of harm the Lanham Act was intended to redress.[6]  See id. at 234.

McDonald's argues that its "conduct was in no way anti-competitive" because it "was the victim of a criminal fraud scheme" perpetrated by a third party. According to McDonald's, "to the extent any of its advertising was 'false,' it was false solely because of the intervening criminal conduct of Jacobson and his coconspirators."  We find this argument unavailing, however, because Phoenix alleges that McDonald's "knowingly and deliberately continued to advertise" that its customers had a "fair and equal chance" to win high-value prizes even after learning that the integrity of its promotional games had been compromised. Moreover, "[s]ection 43(a) provides a strict liability tort cause of action."  Vector Prods., Inc. v. Hartford Fire Ins. Co., 397 F.3d 1316, 1319 (11th Cir. 2005) ("It is

---

[6] Although the Conte Bros. court held that the "loss of sales" suffered by the plaintiffs in that case did not detract from their "ability to compete" and thus was not the type of injury the Lanham Act was designed to redress, the court reached this conclusion after determining that the plaintiff-retailers were not *at all* in competition with the defendant-manufacturers.  Conte Bros., 165 F.3d at 234.  Here, by contrast, Burger King is one of McDonald's direct competitors in the fast food industry.

well-settled that no proof of intent or willfulness is required to establish a violation of Lanham Act § 43(a) for false advertising.").

McDonald's also contends that Phoenix's alleged injuries are not competitive in nature because the challenged advertisements "did not tout the products and services of McDonald's or disparage the products and services of Burger King." We cannot agree. Although the advertisements did not disparage Burger King or tout some intrinsic quality of McDonald's goods and services, the advertisements nonetheless asserted that customers who patronized McDonald's restaurants had an opportunity to win prizes, including the high-value prizes that had been stolen. Moreover, Phoenix alleges that the promotional games were sometimes "physically attached to McDonald's products."

McDonald's further contends that because Phoenix "has neither alleged nor suggested that its reputation was adversely affected by McDonald's advertising," this lack of "reputational injury" counsels against prudential standing. Although McDonald's is correct in asserting that Phoenix does not allege that its reputation was harmed by McDonald's conduct, we cannot say that the lack of alleged "reputational injury," in and of itself, directs us to conclude that Phoenix has failed to allege the type of injury that the Lanham Act was intended to redress. Again, the Lanham Act is not only designed to protect against unfair erosion of a

24

competitor's reputation, it is *also* designed to protect "commercial interests [that] have been harmed by a competitor's false advertising," Conte Bros., 165 F.3d at 234 (alteration in original), and, as stated above, Phoenix alleges such harm. We therefore conclude that the first factor weighs in favor of prudential standing.

## 2. Directness of the Asserted Injury

The second factor requires us to examine the "directness" with which the defendant's conduct affected the plaintiff. Phoenix alleges that by falsely advertising that customers had a fair and equal opportunity to win high-value prizes, McDonald's lured customers to its restaurants and away from Burger King restaurants. According to Phoenix, as a direct result of these false advertisements, it lost sales and incurred additional promotional expenses in its attempts to lure back the customers it lost to McDonald's during the fraudulent promotion.

On one hand, the causal chain Phoenix alleges is similar to that of the typical false advertising claim in which a plaintiff alleges that it lost sales and/or market share as a result of the defendant's false or misleading representations about some characteristic of the defendant's product or services. For example, in Logan v. Burgers Ozark Country Cured Hams Inc., the Fifth Circuit concluded that the second Conte Bros. factor counseled in favor of standing where the plaintiff alleged that the defendant's "literally false advertising about its own goods

25

influenced its customers to buy its product instead of [the plaintiff's] product." 263 F.3d 447, 461 (5th Cir. 2001). In so concluding, the Logan court stated that the plaintiff's ability to license its products "*may have been directly affected by* [the defendant's] false advertising" about the defendant's products. Id. (emphasis added). And in Procter & Gamble, the Fifth Circuit stated that the second factor weighs in favor of standing in cases where "one competitor directly injur[es] another by making false statements about its own goods and thus influenc[es] customers to buy its product instead of the competitor's product." Logan, 263 F.3d at 460 (citing Procter & Gamble, 242 F.3d at 563).

On the other hand, the causal chain Phoenix alleges is more attenuated than that alleged in cases like Logan. Phoenix essentially alleges that (1) McDonald's advertisements falsely represented that customers had a fair and equal chance to win one of the "rare" high-value prizes if those customers patronized McDonald's restaurants and played its games; (2) as a direct result of the misrepresentation regarding the high-value prizes, McDonald's lured customers who would have eaten at *Burger King* (as opposed to one of numerous other fast food competitors), causing Burger King to lose sales; and (3) but for this misrepresentation, these customers would have eaten at *Burger King*, even though the chances of winning one of the "rare" high-value prizes would have been minute had there been no

26

theft, even though only "certain" high-value prizes were stolen, and even though these customers still had a fair and equal opportunity to win all of the other prizes. Accepting Phoenix's allegations as true, the causal chain linking McDonald's alleged misrepresentations about one aspect of its promotional games to a decrease in *Burger King's* sales is tenuous, to say the least.

Taking care not to conflate the prudential standing inquiry with the "materiality" element Phoenix must establish to succeed on the merits of its claim, see Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc., 299 F.3d 1242, 1250 (11th Cir. 2002) ("To succeed on a claim of false advertising, the plaintiff must establish that the defendant's deception is likely to influence the purchasing decision." (internal quotation marks omitted)), we conclude that the second factor counsels against prudential standing.

### 3. Proximity to the Allegedly Harmful Conduct

The third factor requires us to examine the proximity of the plaintiff to the allegedly harmful conduct. In examining this factor, we must determine whether there is an "identifiable class" of persons "whose self-interest would normally motivate them to vindicate the public interest" by bringing a suit. Conte Bros., 165 F.3d at 234. "The existence of such a class diminishes the justification for allowing a more remote party . . . to perform the office of a private attorney

27

general." Joint Stock Soc'y v. UDV N. Am., Inc., 266 F.3d 164, 182 (3d Cir. 2001) (internal quotation marks omitted).

Here, the district court held, and McDonald's asserts on appeal, that the consumers who were denied a fair and equal opportunity to win the high-value prizes as advertised constitute an "identifiable class" of persons whose self-interest would normally motivate them to sue McDonald's regarding its false advertising. But this can be said about any false advertising claim, as the consumers who were diverted from the plaintiff's product to the defendant's product in reliance on the defendant's allegedly false advertisements would always have a natural self-interest in suing for fraud. As such, if we accept the district court's and McDonald's reasoning, this factor would never counsel in favor of prudential standing. Moreover, consumers would not be able to vindicate the public interest via the Lanham Act, as "the several circuits that have dealt with the question are uniform in their categorical denial of Lanham Act standing to consumers." Made in the USA Found. v. Phillips Foods, Inc., 365 F.3d 278, 281 (4th Cir. 2004); see also Conte Bros., 165 F.3d at 229 (reiterating precedent holding that consumers lack standing under the Lanham Act and stating that a contrary conclusion would "ignore the purpose of" the Act); Barrus v. Sylvania, 55 F.3d 468, 470 (9th Cir. 1995) (holding that consumers lack standing to bring false advertising claims under

28

the Lanham Act because they cannot allege either a commercial or competitive injury).

Furthermore, courts applying the Conte Bros. test have generally considered whether other *commercial entities* were the more appropriate parties to vindicate the competitive harm wrought by the defendant's alleged misconduct. See, e.g., Joint Stock Soc'y, 266 F.3d at 182 (stating that Russian vodka manufacturers that exported vodka to the U.S. were better suited to bring a false advertising claim against the defendant and "were more proximate to the claimed injury" than the plaintiff-manufacturer that did not export its vodka to the U.S.); Conte Bros., 165 F.3d at 235 (concluding that motor-oil manufacturers had a more concrete interest in preserving the reputation of motor oil than the plaintiffs as retailers of engine additives); but see Procter & Gamble, 242 F.3d at 563-64 (stating that although distributors "probably do not have standing to sue under the Lanham Act" because the Act "does not give consumers standing to sue[,]" distributors "are more immediate to the injury than is [plaintiff-manufacturer]" and "could vindicate the public interest . . . by suing for fraud"). As such, consumers "should be irrelevant to this analysis." Ford v. NYLCare Health Plans of Gulf Coast, Inc., 301 F.3d 329, 338 (5th Cir. 2002) (Benavides, J., concurring).

Again, Phoenix alleges that as a direct result of McDonald's false and

misleading representations regarding the high-value prizes, McDonald's lured customers away from Phoenix and its affiliated franchisees, which, in turn, lost sales and market share. Accepting these allegations as true, we can think of no "identifiable class" of persons that is *more* proximate to the claimed injury than fast food franchisees such as Phoenix and the putative class it seeks to represent. As such, the third factor weighs in favor of prudential standing.

### 4. Speculative Nature of the Alleged Damages

Under the fourth factor of the <u>Conte Bros.</u> test, we examine the speculative nature of the plaintiff's alleged damages. According to Phoenix, its damages are not "speculative" because it would be "relatively straightforward" to calculate its damages as "an appropriate share of all profits associated with sales generated by the fixed promotional games" based on market share. We disagree.

As the district court noted, only "certain" high-value prizes were stolen, and customers still had a fair and equal opportunity to win one of the relatively numerous low- and mid-value prizes McDonald's offered, because those prizes were unaffected by the theft. Moreover, the fast food market consists of *many* competitors, only two of which are McDonald's and Burger King. In our view, it requires too much speculation to conclude that an ascertainable percentage of both the increase in McDonald's sales and the concomitant decrease in *Burger King's*

30

sales during the several-year run of the games is directly attributable to McDonald's alleged misrepresentations about the chances of winning high-value prizes.

Phoenix also argues that at the pleading stage, the focus should be on what the complaint alleges, not on whether Phoenix may be able to prove the exact number of customers lured to McDonald's, because this is a matter for discovery and expert testimony. Although "general factual allegations of injury resulting from the defendant's conduct *may* suffice" to support standing "[a]t the pleading stage," Lujan v. Defenders of Wildlife, 504 U.S. 555, 561, 112 S.Ct. 2130, 2137, 119 L.Ed.2d 351 (1992) (emphasis added), to "presume" that Phoenix's allegations "embrace those specific facts that are necessary to support" its claim to an appropriate share of McDonald's profits from the compromised games requires too much conjecture. See id. Even accepting Phoenix's allegations as true, the speculative nature of the damages it allegedly incurred as a result of McDonald's representations regarding the high-value prizes is inescapable.

Phoenix also contends that disgorgement of the profits McDonald's made during the "fixed" promotion would be an appropriate remedy "if the district court's premature fears [regarding the incalculable nature of Phoenix's damages] were substantiated." Disgorgement of "wrongful" profits "initially developed as a

remedy to provide a plaintiff relief in equity, to serve as a proxy for damages, or to deter the wrongdoer from continuing his violations" and "is most appropriate if damages are otherwise nominal." BASF Corp. v. Old World Trading Co., 41 F.3d 1081, 1095-96 (7th Cir. 1994). But as the Third Circuit stated in Joint Stock Soc'y, "[i]f a request for relief that may be sought by any party sufficed under the fourth factor of the Conte Bros. test, that factor would be essentially meaningless, and we refuse to undermine the fourth factor in this way." Joint Stock Soc'y, 266 F.3d at 185. "The aim of [prudential standing] is to determine whether the plaintiff is 'a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers.'" Conte Bros., 165 F.3d at 225 (quoting Bender v. Williamsport Area Sch. Dist., 475 U.S. 534, 546 n.8, 106 S.Ct. 1326, 1334 n.8, 89 L.Ed.2d 501 (1986)). Accordingly, Phoenix may not bolster its "case for prudential standing by relying on forms of monetary relief that [it] would receive as a vicarious avenger of the general public's right to be protected against . . . false advertisements." Joint Stock Soc'y, 266 F.3d at 185 (internal quotation marks omitted).

We thus conclude that the fourth factor weighs against prudential standing.

### 5. Risk of Duplicative Damages

The fifth and final factor under the Conte Bros. test requires us to assess the

risk of duplicative damages *or* the complexity of apportioning damages. The district court concluded that this factor weighs against standing. We agree.

If we were to hold that Phoenix has prudential standing to bring the instant claim, then every fast food competitor of McDonald's asserting that its sales had fallen by any amount during the relevant time period would *also* have prudential standing to bring such a claim. And if every fast food competitor had standing to bring such a claim, regardless of the amount in controversy, regardless of the amount of lost sales or market share directly attributable to the falsity of the advertisement, and regardless of the impact on the competitor's goodwill or reputation (as the advertisements made no mention of any competitor), the impact on the federal courts would be substantial. Furthermore, apportioning damages among these competitors would be a highly complex endeavor.

Phoenix argues that courts applying the Conte Bros. test have assessed the risk of duplicative damages either by examining "the plaintiff's position in the distribution chain relative to the defendant" or by examining "whether the injury is directly related to the market" in which they compete. But courts applying the Conte Bros. test *also* have assessed the risk of duplicative damages by examining the number of potential claimants in the same position in the distribution chain as the plaintiff and/or in the same market as the plaintiff. For example, the Third

Circuit in Joint Stock Soc'y assessed the fifth factor by noting that if the plaintiffs were granted prudential standing, false advertising claims could be brought against the defendant by, inter alia, all vodka manufacturers in the U.S. market *and* all vodka manufacturers who, like the plaintiffs, had not entered the U.S. market but had taken minimal preparatory steps for entry. 266 F.3d at 184-85. Thus, the Joint Stock Soc'y court considered both the number of potential claimants occupying the same position in the distribution chain as the plaintiffs (manufacturers) and the number of potential claimants in the same market as the plaintiffs (manufacturers who had not entered the U.S. market) to conclude that the fifth factor weighed against prudential standing. In Logan, the Fifth Circuit determined that the fifth factor weighed in favor of prudential standing because "Logan appear[ed] to be the only plaintiff who could bring a Lanham Act false advertising claim against [the defendant] based on" the challenged advertisements. 263 F.3d at 461. And in Procter & Gamble, the Fifth Circuit concluded that the fifth factor counseled against standing for Procter & Gamble in part because *every competitor in the market could sue*" the defendant if Procter & Gamble were allowed standing. 242 F.3d at 564 (emphasis added).

Accordingly, we conclude that the fifth factor weighs against standing.

34

### 6. Weighing The Totality of the Factors

To summarize, the first and third Conte Bros. factors weigh in favor of prudential standing, while the second, fourth, and fifth factors weigh against prudential standing. Admittedly it is a close question, but we conclude that on balance, Phoenix does not have prudential standing to bring its claim against McDonald's. Although Phoenix and the class it seeks to represent are McDonald's "direct competitors," Phoenix has alleged a competitive harm to their commercial interests, and there is no identifiable class of persons that is more proximate to the claimed injury, because of the attenuated link between the alleged injury and McDonald's alleged misrepresentations, the speculative nature of the claimed damages, the potential complexity in apportioning damages, and the significant risk of duplicative damages, we hold that Phoenix does not have prudential standing to bring a false advertising claim under the Lanham Act against McDonald's.

In so holding, we say nothing about the outcome of this analysis if, for example, the facts were such that McDonald's had falsely advertised the odds of winning all of its prizes (low-, mid-, and high-value), *or* if McDonald's were only giving away a single prize and falsely represented the odds of winning, as these hypotheticals present factual scenarios materially different from the facts of this

35

case. Indeed, as stated above, a salient virtue of the <u>Conte Bros.</u> test is that it provides a flexible yet principled means of determining the existence of prudential standing for disparate factual scenarios, thereby allowing courts to foreclose standing on one set of facts while recognizing standing when presented with a slightly (but materially) different set of facts.

### III. CONCLUSION

For the foregoing reasons, we **AFFIRM**.