[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 13, 2008
THOMAS K. KAHN
CLERK

No. 06-15084

_____

D. C. Docket No. 04-22646-CV-UUB

NATURAL ANSWERS, INC.,
a Florida Corporation,
BRIAN A. FEINSTEIN,

Plaintiffs-Appellants,

versus

SMITHKLINE BEECHAM CORPORATION,
a Pennsylvania Corporation,
f.k.a. Beecham Holdings, Inc.,
d.b.a. GlaxoSmithKline, et al.,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(June 13, 2008)**

Before TJOFLAT, MARCUS and WILSON, Circuit Judges.

MARCUS, Circuit Judge:

At issue in this trademark infringement case is whether SmithKline Beecham Corporation, SmithKline Beecham Consumer Healthcare, and GlaxoSmithKline Consumer Healthcare (collectively "GSK") infringed the trademark rights of Natural Answers, Inc. and its Chief Executive Officer Brian A. Feinstein (collectively "Natural Answers") in their unregistered mark HERBAQUIT LOZENGES, and whether GSK falsely advertised their product, Commit Lozenges, which was billed as "the first and only stop smoking lozenge." After thorough review, we affirm the district court's entry of final summary judgment for GSK.

I.

The facts essential to this appeal are straightforward. Natural Answers develops, manufactures, and markets a variety of herbal supplements, and from 2000 until 2002 it sold HerbaQuit Lozenges, which were designed to "help satisfy cravings related to the smoking habit," particularly the "psychological and habitual aspects of smoking." Although Natural Answers filed a federal trademark application for HERBAQUIT with the United States Patent and Trademark Office on April 12, 1994, and also filed an application for HERBAQUIT LOZENGES on May 27, 1995, neither application was approved, and the mark HERBAQUIT

2

LOZENGES has never been registered as a trademark. Nonetheless, HerbaQuit Lozenges entered the market in January 2000 and were sold by Natural Answers in drugstores, supermarkets, convenience stores, and over the Internet.  HerbaQuit Lozenges were an herbal product containing no nicotine, but were designed and marketed to help reduce and control tobacco cravings or to help quit smoking entirely.  In March 2001, Natural Answers contacted GSK to solicit interest in forming a joint venture to promote HerbaQuit Lozenges.  Although GSK expressed some initial interest in learning about Natural Answers's product, GSK ultimately declined that offer in April 2001.  Notably, the sale of HerbaQuit Lozenges was discontinued in March 2002, after selling approximately 50,000 packages.  Indeed, by November 2002, the website affiliated with HerbaQuit Lozenges was no longer operational, and neither the product nor its promotional materials have returned to the public market since that time.

Natural Answers has conceded that it does not have the ability or resources to market HerbaQuit Lozenges.  However, Brian Feinstein, the CEO of Natural Answers, testified that he sent a letter to Philip Morris in December 2003 to solicit a joint venture to promote HerbaQuit Lozenges.  He said that Philip Morris responded to his solicitation by requesting further information.  A deal was never struck between Natural Answers and Philip Morris, and Natural Answers presented

3

no other evidence, documentary or otherwise, about their negotiations.

On November 6, 2002, more than seven months after the sale of HerbaQuit Lozenges was discontinued, GSK launched the Commit Lozenges product, advertising it as "the first and only stop smoking lozenge." Commit Lozenges are an FDA-approved stop-smoking aid in the form of a fast-acting nicotine lozenge to relieve the withdrawal symptoms that may accompany smoking cessation. GSK began developing Commit Lozenges in January 1998, applied for FDA approval on the product in late 2000, and received FDA approval following clinical tests in October 2002. GSK has advertised Commit Lozenges in the national print media, on television, and over the Internet. They are sold primarily in pharmacies, supermarkets, and via the Internet. COMMIT is a registered federal trademark held by GSK since May 20, 2003.

On October 20, 2004, Natural Answers filed this ten-count complaint against GSK in the United States District Court for the Southern District of Florida claiming: (1) Federal Trademark Infringement under 15 U.S.C. § 1125(a); (2) Federal Trademark Infringement Based on Reverse Confusion under 15 U.S.C. § 1125(a); (3) Federal Unfair Competition under 15 U.S.C. § 1125(a); (4) False Advertising under 15 U.S.C. § 1125(a); (5) Civil Theft of Trade Secrets under Fla. Stat. §§ 771.11, 772.103, 772.194, 812.014 and 812.081; (6) Common Law

4

Trademark Disparagement; (7) Attempted and Actual Monopolization under the Sherman Act, 15 U.S.C. § 2; (8) Common Law Unfair Competition; (9) Common Law Trademark Infringement; and (10) Violation of Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. §§ 501.201-501.213. Natural Answers simultaneously moved for a temporary restraining order and preliminary injunction. GSK, in turn, moved to dismiss the complaint on November 29, 2004, and, on February 4, 2005, the district court dismissed the claims for civil theft of trade secrets and attempted and actual monopolization pursuant to Fed. R. Civ. P. 12(b)(6).

On December 13, 2004 and January 12, 2005, evidentiary hearings relating to the motion for a temporary restraining order and preliminary injunction were conducted by a magistrate judge, who recommended denying the preliminary injunction. The district court adopted the magistrate judge's Report and Recommendation in its entirety.

Thereafter, Natural Answers moved for partial summary judgment on its false advertising claim. Not surprisingly, GSK moved for summary judgment on all of Natural Answers's remaining claims. Soon thereafter, the district court granted GSK's motion for summary judgment in its entirety and denied Natural Answers's motion for partial summary judgment. First, the district court granted

5

summary judgment against Natural Answers's false advertising claim, reasoning that Natural Answers had not been and was not likely to be injured as a result of GSK's advertisement of Commit Lozenges as "the first and only stop smoking lozenge," because HerbaQuit Lozenges and Commit Lozenges were never marketed or sold contemporaneously. The district court also granted summary judgment against Natural Answers on the false advertising and trademark disparagement claims concluding that GSK's advertisements were not false, because, under applicable federal statutes and regulations, Natural Answers was prohibited from marketing HerbaQuit Lozenges as a smoking cessation product. Second, the district court granted summary judgment against Natural Answers's federal and common law trademark infringement and unfair competition claims on the ground that no reasonable juror could conclude on this record that a likelihood of confusion exists between the marks HERBAQUIT LOZENGES and COMMIT as used by the parties. Finally, the district court granted GSK summary judgment on Natural Answers's FDUTPA claim, because it was premised solely on meritless claims of trademark infringement and false advertising.

This timely appeal ensued.

## II.

The claims brought by Natural Answers are comprised of either violations of

6

the Lanham Act or violations of Florida's common law and statutes that are, in turn, based on actual violations of the Lanham Act. As a result, if Natural Answers cannot succeed on its Lanham Act claims, all of its claims necessarily fail. Our analysis, therefore, begins, and ultimately ends, with a determination that Natural Answers's asserted Lanham Act claims, seeking relief from unfair competition based upon theories of trademark infringement[1] (taking the form of direct trademark infringement, reverse confusion trademark infringement, and false designation of origin), and false advertising,[2] fail.

We review a district court's grant of summary judgment de novo. Kingsland v. City of Miami, 382 F.3d 1220, 1225 (11th Cir. 2004). Summary judgment is appropriate where "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In making this determination, "[w]e view the evidence and all factual inferences therefrom in the light most favorable to the non-moving party, and resolve all

---

[1] "Any person who shall, without the consent of the" trademark right holder, "use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive . . . shall be liable" for trademark infringement." 15 U.S.C. § 1114(1).

[2] Liability for false advertising arises when "[a]ny person who, on or in connection with any goods . . . uses in commerce any . . . false or misleading description of fact, or false or misleading representation of fact, which . . . in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods[.]" 15 U.S.C. § 1125(a).

7

reasonable doubts about the facts in favor of the non-movant."  Kingsland, 382 F.3d at 1226.

A.

To bring a trademark infringement claim under the Lanham Act, a plaintiff must hold a valid trademark.  Under the Lanham Act, a trademark is deemed abandoned, and, thus no longer valid, "[w]hen its use has been discontinued with intent not to resume such use."  15 U.S.C. § 1127; see also Cumulus Media, Inc. v. Clear Channel Commc'ns, Inc., 304 F.3d 1167, 1173 (11th Cir. 2002) ("[A] defendant who successfully shows that a trademark plaintiff has abandoned a mark is free to use the mark without liability to the plaintiff."); Tally-Ho, Inc. v. Coast Cmty. Coll. Dist., 889 F.2d 1018, 1022-23 (11th Cir. 1989) (per curiam) ("Trademark ownership is always appurtenant to commercial activity.  Thus, actual and continuous use is required to acquire and retain a protectible interest in a mark.") (footnote omitted).  "Abandonment is trademark law's way of recognizing that trademark rights flow from use."  Cumulus Media, Inc., 304 F.3d at 1173 (quotation marks and citation omitted); 5 McCarthy on Trademarks and Unfair Competition § 17:1 (4th ed. 2001) (explaining that if a trademark holder ceases using a mark with an intent not to resume its use, the mark is deemed abandoned and "falls into the public domain and is free for all to use . . . . Abandonment paves

8

the way for future possession and property in any other person").

Thus, a defendant must establish two elements in order to show that a plaintiff has abandoned his trademark: "[1] that the plaintiff has ceased using the mark in dispute and [2] that he has done so with an intent not to resume its use." Cumulus, 304 F.3d at 1174 (footnote omitted). For the purposes of abandonment, the Lanham Act defines "use" as "the bona fide use of such mark made in the ordinary course of trade, and not made merely to reserve a right in a mark." 15 U.S.C. § 1127. The Lanham Act directs that "[i]ntent not to resume [use] may be inferred from circumstances." Id. Such an intent cannot be far-flung or indefinite; rather there must be an intent "to resume use within the reasonably foreseeable future," Silverman v. CBS Inc., 870 F.2d 40, 46 (2d Cir. 1989), in the United States, Imperial Tobacco Ltd. v. Philip Morris, Inc., 899 F.2d 1575, 1579 (Fed. Cir. 1990). See also Grocery Outlet, Inc. v. Albertson's, Inc., 497 F.3d 949, 951 (9th Cir. 2007) (per curiam) (finding "intent to resume use of the . . . mark within the reasonably foreseeable future during the short period of alleged nonuse" prevented the mark from being abandoned). "Nonuse for 3 consecutive years shall be prima facie evidence of abandonment," 15 U.S.C. § 1127, which creates a "rebuttable presumption of intent not to resume use." Cumulus Media, Inc., 304 F.3d at 1174. Natural Answers has not used its mark in commerce for well over three years and,

9

thus, GSK has the benefit of the rebuttable presumption of intent not to resume its use. The burden of production, although not the ultimate burden of persuasion, shifts to Natural Answers "to produce evidence that [it] either used the mark during the statutory period or intended to resume use." Id. at 1177.

On this record, it is undisputed that the HERBAQUIT LOZENGES mark (which has never been registered) has not been used in commerce since, at the latest, March 2002. Drawing all reasonable inferences in favor of Natural Answers, as we must on summary judgment, no reasonable fact finder could determine that Natural Answers had used or evinced any intention to use the HERBAQUIT LOZENGES mark in the United States at any point after the product was removed from the market in March 2002. Indeed, Natural Answers has provided no evidence of actual and concrete plans to resume use in the reasonably foreseeable future. All it presented to the district court was the bare assertion by its CEO that it intended to resume use if it could find ample funding and the unsupported assertion that Philip Morris had requested more information from Natural Answers after it sent Philip Morris a letter soliciting a joint venture in 2003. Such putative negotiations amount to nothing more than an unsolicited proposal by Natural Answers that led nowhere. Quite simply, that is not enough. Indeed, if all a party had to do to avoid a finding of abandonment was to aver that

10

it never intended to abandon the trademark, then no trademark would ever be abandoned, no matter how long its use had been withdrawn from the market, or how inchoate and speculative any intention to resume its use. See Imperial Tobacco Ltd., 899 F.2d at 1581 ("An averment of no intent to abandon is little more than a denial in a pleading, which is patently insufficient to preclude summary judgment on the ground the facts are disputed."). Because the record on summary judgment unquestionably demonstrates that Natural Answers has in no way undertaken "actual and continuous use" to "retain" an enforceable interest in HERBAQUIT LOZENGES, see Tally-Ho, Inc., 889 F.2d at 1022-23; 15 U.S.C. § 1127, Natural Answers does not hold a valid trademark upon which it can base a Lanham Act trademark infringement claim.

## B.

Not only is Natural Answers barred from bringing a Lanham Act trademark infringement claim because it does not hold a valid trademark, it also lacks prudential standing to bring its separate Lanham Act false advertising claim. A Lanham Act false advertising claim arises when "[a]ny person who, on or in connection with any goods . . . uses in commerce any . . . false or misleading description of fact, or false or misleading representation of fact, which . . . in commercial advertising or promotion, misrepresents the nature, characteristics,

qualities, or geographic origin of his or her or another person's goods[.]" 15 U.S.C. § 1125(a). The intent of this provision is to protect "commercial interests [that] have been harmed by a competitor's false advertising, and [to secure] to the business community the advantages of reputation and good will by preventing their diversion from those who have created them to those who have not." Phoenix of Broward, Inc. v. McDonald's Corp., 489 F.3d 1156, 1168 (11th Cir. 2007), cert. denied, 128 S. Ct. 1647 (2008) (quoting Conte Bros. Auto., Inc. v. Quaker State-Slick 50, Inc., 165 F.3d 221, 234 (3d Cir. 1998)).

In Phoenix, this Court, as a matter of first impression, determined when a plaintiff has prudential standing to bring a Lanham Act false advertising claim. 489 F.3d at 1167. In that case, a class of Burger King franchisees sued McDonald's, their undisputed competitors in the fast food restaurant industry, alleging that McDonald's' promotional games advertisements constituted false advertising under the Lanham Act. We posited that five factors should be weighed to determine whether a plaintiff has prudential standing to bring a Lanham Act false advertising claim:

> (1) The nature of the plaintiff's alleged injury: Is the injury of a type that Congress sought to redress in providing a private remedy for violations of the [Lanham Act]?

> (2) The directness or indirectness of the asserted injury.

(3) The proximity or remoteness of the party to the alleged injurious conduct.

(4) The speculativeness of the damages claim.

(5) The risk of duplicative damages or complexity in apportioning damages.

Phoenix, 489 F.3d at 1163-64 (citing Conte Bros. Auto., 165 F.3d at 233). Applying these factors in Phoenix, we concluded that the plaintiffs lacked prudential standing, because, while there were "commercial interests . . . harmed by a competitor's false advertising," and the plaintiffs were the most proximate class of persons subject to the alleged injury, the connection between the plaintiffs' asserted lost sales and increased promotional expenses and the defendant's false advertisements was tenuous, the nature of the alleged damages was speculative, and there was a risk of duplicative damages. Id. at 1169-73.

Here, an application of the Phoenix factors undeniably establishes that Natural Answers lacks prudential standing to bring a Lanham Act false advertising claim. Indeed, not a single one of the five factors favors Natural Answers.

In the first place, Natural Answers has not alleged the type of injury Congress sought to redress in the false advertising provision of the Lanham Act. As we explained in Phoenix, the purpose of the Lanham Act is to protect commercial interests from a competitor's false advertising and to protect the

13

business community from having its reputation and goodwill diverted. 489 F.3d at 1168; see also 15 U.S.C. § 1127 (explaining that the Lanham Act is designed "to protect persons engaged in . . . commerce against unfair competition"). This factor weighed in favor of prudential standing in Phoenix, because the plaintiffs alleged that the defendant was their direct competitor and that the defendant's false advertisements caused the plaintiffs to both lose sales and incur increased promotional costs. Id. Here, in sharp contrast, Natural Answers could suffer no such commercial or competitive injury, because it was no longer selling or promoting HerbaQuit Lozenges at the time of the alleged injury. Simply put, Natural Answers could not have lost any customers or potential customers. To the extent that Natural Answers suffered any injury at all, it did not sustain the kind of injury Congress was concerned about when it passed the Lanham Act. See id. at 1163 (explaining that "[t]he congressionally-stated purpose of the Lanham Act evinces a congressional intent to limit standing to a narrow class of potential plaintiffs possessing interests the protection of which furthers th[e] congressionally stated purpose" and denying standing to "parties that have *not* had their competitive or commercial interests affected by the defendant's conduct") (internal quotation marks omitted).

Second, there is no direct relationship between GSK's conduct and the

14

claimed injury. The "typical false advertising claim" is one where "a plaintiff alleges that it lost sales and/or market share as a result of the defendant's false or misleading representations about some characteristic of the defendant's product or services." Id. at 1169. Thus, in Phoenix, we found this factor weighed against standing. Here, the injury claimed is far more remote. Natural Answers alleges only that GSK misled smoking cessation consumers by claiming that Commit Lozenges was the "first and only stop smoking lozenge"; that this statement "more than likely influenced the purchasing decision of customers since GSK, an industry giant, can influence the purchasing decisions of customers"; and that, as a result, "[t]he HERBAQUIT LOZENGES mark was weakened." (Compl. ¶¶ 168, 173-74). Again, because Natural Answers was not selling or promoting HerbaQuit Lozenges at the time of the allegedly false advertising, it cannot claim to have suffered lost sales, lost market share, or increased promotional costs. In fact, all it can allege is that GSK's conduct "might" cause the value of the HERBAQUIT LOZENGES mark to "weaken" at some wholly unknown time if Natural Answers chooses to reintroduce it to the market. This factor, too, weighs against prudential standing.

Further, GSK's allegedly false advertising obviously affects companies that actually sell smoking cessation products far more directly than it could affect Natural Answers. Moreover, the amount of Natural Answers's claimed damages is

15

entirely speculative. This is not a case where the plaintiff has lost any sales or market share. Rather, Natural Answers has merely postulated that the weakening of its HERBAQUIT LOZENGES mark might cause it to lose sales in the future if it reenters the smoking cessation market. So indefinite a prediction of harm will not support standing.

Finally, allowing Natural Answers to sue also presents a risk of duplicative damages. Id. at 1172. In Phoenix, we concluded that this factor weighed against prudential standing, because "[i]f we were to hold that Phoenix has prudential standing to bring the instant claim, then every fast food competitor of McDonald's asserting that its sales had fallen by any amount during the relevant time period would also have prudential standing to bring such a claim." Id. The instant case presents this problem in an even more extreme form. Indeed, if Natural Answers has prudential standing to bring this claim, then any company that ever had, will have, or, possibly, may have a smoking cessation product whose associated trademark could potentially be "weakened" would have prudential standing.

In short, each of the five Phoenix factors weighs decidedly against finding that Natural Answers has prudential standing to bring a Lanham Act false advertising claim against GSK.

16

C.

Since Natural Answers is unable to bring an unfair competition claim under the Lanham Act under the theory of either false advertising or trademark infringement, it follows that the common law claims based on unfair competition and trademark infringement must fail as well.  Planetary Motion, Inc. v. Techsplosion, Inc., 261 F.3d 1188, 1193 n. 4 (11th Cir. 2001) ("Courts may use an analysis of federal infringement claims as a 'measuring stick' in evaluating the merits of state law claims of unfair competition.") (quoting Investacorp, Inc. v. Arabian Inv. Banking Corp. (Investcorp) E.C., 931 F.2d 1519, 1521 (11th Cir. 1991)).  Thus, Natural Answers's common law trademark infringement claims must fail because it has abandoned the HERBAQUIT LOZENGES mark by not using it in commerce or maintaining any intent to use it in commerce since 2002.  See Tally-Ho, Inc., 889 F.2d at 1023 n.6 (explaining that common law trademark rights "can be lost through abandonment").  Similarly, Natural Answers's common law claim sounding in false advertising fails because, just as with the false advertising claim brought under the Lanham Act, Natural Answers does not have a commercial or competitive interest, lacks a direct injury, lacks proximity to the alleged conduct, and presents a speculative and potentially duplicative damages claim.  See 5 McCarthy on Trademarks and Unfair Competition §§ 14:24, 27:2; see

17

also Conte Bros. Auto., Inc., 165 F.3d at 230 (explaining that the Lanham Act's standing requirements, including those pertaining to false advertising claims, are codifications of the common law standing requirements).

D.

Finally, as Natural Answers concedes, its claim for a violation of the Florida Deceptive and Unfair Trade Practices Act rises or falls on the success of its trademark infringement and false advertising claims. The purpose of the FDUTPA is "[t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.202(2) (2006). To bring a claim under this Act, the plaintiff must have been aggrieved by the alleged unfair and deceptive act. See Citibank (South Dakota) N.A. v. Nat'l Arbitration Council, Inc., No. 3:04-cv-1076, 2006 WL 2691528, at *3 (M.D. Fla. Sept. 19, 2006); State of Fla., Office of Atty. Gen., Dep't of Legal Affairs v. Tenet Healthcare Corp., 420 F. Supp. 2d 1288, 1309 (S.D. Fla. 2005) (citing Haun v. Don Mealy Imps., 285 F. Supp. 2d 1297, 1308 (M.D. Fla. 2003)). As we have made clear already, Natural Answers could suffer no injury as a result of the alleged trademark infringement, because it does not hold a valid mark in HERBAQUIT LOZENGES that is subject to infringement. Moreover, Natural

18

Answers could suffer no injury as a result of the allegedly false advertising, because its product is not and has never competed with Commit Lozenges, and Natural Answers's complaint does not allege that it was injured in any manner as a consumer of Commit Lozenges. Thus, just as with its other claims, Natural Answers lacks standing to pursue a claim under the FDUPTA.

In short, because Natural Answers cannot assert claims for unfair competition, trademark infringement, and false advertising under the Lanham Act, as well as its common law claims for unfair competition, trademark infringement, and trademark disparagement, and because there is no basis for its claim under FDUPTA, we affirm the district court's entry of final summary judgment for GSK.[3]

**AFFIRMED**.

---

[3] We need not and do not address the other grounds upon which the district court granted Appellees final summary judgment.